SAMUEL L. SEZZIN, ET UX. *v.* RITA M. STARK

[No. 17, October Term, 1946.]

*Decided November 20, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*William R. Semans,* with whom were *Barton, Wilmer,
Bramble, Addison* and *Semans* on the brief, for the ap-
pellants.

*Herbert L. Grymes,* with whom was *Frank J. Schap*
on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

In May, 1944, the appellants, as hereinafter known,
Samuel L. Sezzin and Blanche Sezzin, his wife, purchased
the premises at 811 North Charles Street, Baltimore.
The appellee, as hereinafter known, Rita M. Stark, rented
from them on March 8, 1945, the second floor rear apart-
ment. The rear of this property was divided into three
furnished apartments, one on the first floor, one on the
second floor, and one on the third floor. These were
known as the rear apartments as distinguished from
those in front. On the south side and about midway of
the house an air and light shaft ran from the ceiling of
the first floor apartment up to and above the level of the
roof, where it was capped with a skylight. The bottom
of this shaft was located on the same level with the
ceiling of the first floor apartment and consisted of a

frame with three panes of glass. For the purpose of this case this frame with the three panes of glass will be known as the bottom of the shaft. The frame was attached to the ceiling by hinges and could be opened and closed by pulling or releasing a cord. The dimensions of the shaft were five feet by two feet on the inside. This was the only means of getting air and light into these rear apartments. The rooms on the second and third floors directly above the first floor room, where the window frame was in the ceiling, each had a window opening into the shaft, the sills of which were three feet three inches above the floor. From the sill of the window on the second floor, opening into the shaft, to the ceiling of the first floor room and the bottom of the shaft was a distance of four feet. Just outside of these windows on the second and third floors leading into the shaft, and directly under them, were clothes hampers fastened on the outside of the windows in the shaft by hooks. They were placed there by a former owner of the apartment house to provide a place for the tenants to store their soiled clothes. There was nothing under these hampers to catch any clothes that might fall out of them, except the bottom of the shaft. There was no electric light in the airshaft. The only light entering it came from the skylight in the roof, or from electric lights in the two apartments which it served.

Rita M. Stark, the appellee, was a married woman whose husband was temporarily absent with the Armed Forces of the United States. She went to this house on March 7, 1945, looking for a furnished apartment and was shown the second floor apartment by Mrs. Sezzin, one of the appellants. She saw and was shown the location of the clothes hamper in the shaft on the outside of the window. Mrs. Sezzin did not call to the appellee's attention the fact that there was a glass floor at the bottom of the shaft beneath the clothes hamper. There was no wire construction over the bottom of the shaft. On March 8, 1945, when appellee rented the apartment from Mrs. Sezzin she was given a list of the household

articles. Among these was a long-handled wall brush and a few other things. Mrs. Stark could not find these at first but eventually found them "down in the left hand side of the shaft," which she removed and did not replace there. The appellee had occasion to look into the shaft from time to time and saw at the bottom, a distance of only four feet, "what appeared to be a solid floor." She said it was quite dusty down there and she had never seen light coming through the bottom of the shaft. The janitor testified that he had never cleaned the bottom of the shaft since the appellants bought the apartment house in May, 1944.

A Mrs. Hipp, the tenant of the first floor apartment, testified that she got some light through the bottom of the shaft, "she didn't get a bright light." She said that enough light came through in the daytime so that she could get anything she wanted out of the room without turning on the electric light. She obtained no air through the shaft. She said that she had not opened the bottom of the shaft since the appellants had owned the property because soot came through. The third floor tenant, Miss Mauverine Miles, testified that in looking down the shaft from the third floor she could not tell what kind of material covered the bottom of the shaft.

On the evening of July 6, 1945, two girls, Miss Miles and a Miss Hilton, both of whom occupied the third floor apartment directly above that occupied by the appellee, knocked at appellee's door and told her that in removing some clothes from their hamper they had dropped some articles down alongside of their clothes hamper and this clothing had fallen on the bottom of the shaft. They asked appellee if they could get these. The appellee and the two girls then went into the room leading into the shaft. They looked into the shaft which was dark. However they could see the clothes, four feet away, lying at the bottom of the shaft. One article was on the right-hand side and the other was on the left-hand side. These articles of clothing had dropped at different times. The appellee volunteered to get down in the shaft and get

the clothing as she was cleaning her apartment and had on working clothes while the two girls were dressed in "good clothes." The two girls told appellee not to do that because they did not want her doing things for them. Miss Miles testified that Miss Hilton told the appellee, " 'I thing it might be glass,' or something to that effect, her exact words I am not sure." Miss Hilton, being out of the State, did not testify at the trial. The appellee testified that as she was getting in the shaft Miss Hilton said to her, "Be careful, there may be some glass down there." Appellee said that the reason she went in the shaft was "because to my mind there was a solid floor and it had never given the appearance of being anything else. So they dropped clothing and I did not see any reason why I should not go down and recover their clothing."

Appellee sat on the window sill, turned her feet around and let herself down into the shaft. She picked up the article of clothing on the right-hand side and handed it to the girls, who then called her attention to the other article over on the left. She moved one foot to get over to the left side and then the bottom of the shaft went through. She landed on the floor of the first floor apartment where it was dark until the light was turned on. The two girls came down from the second floor apartment. Mrs. Hipp heard the noise and she and her husband went into the room and he turned on the light and they found the appellee sitting on the floor. Mrs. Hipp testified that the appellee then said that she did not know why she did such a silly thing and that she was not in the habit of doing things like that. Appellee denied she made this statement. The appellee was taken to the hospital in Baltimore where it was found that in addition to other injuries her right leg was fractured. Her left foot was operated on. She remained in the hospital in Baltimore until July 27, 1945, when she returned to her home in Miami, Florida. At the time of the accident appellee was employed as a stenographer at wages of $45 a week. She did not return to work until early in January, 1946.

Suit was entered by appellee against appellants on November 25, 1945, which resulted in a verdict by a jury for the appellee in the amount of $1,000. From the judgment on that verdict the appellants appeal.

The appellants assign as error the failure of the trial court to grant their C and D prayers. These prayers in effect asked the Court to instruct the jury, (1) that, under the evidence, the appellants were not guilty of primary negligence directly contributing to the accident, and (2) if they were, the facts showed as a matter of law that appellee was also guilty of negligence directly contributing thereto.

This Court is not called upon to decide whether the appellants were guilty (1) of primary negligence or (2) whether the appellee was guilty of contributory negligence. It is simply our duty to decide whether there was evidence legally sufficient to give the jury the opportunity to decide these questions upon the facts presented and the material inferences of facts therefrom.

Summarizing, there was evidence that the landlord provided the hampers outside of the windows in the shaft for the soiled clothes of the tenants. There was no screen or other device provided to catch any articles which might fall out of the hampers other than the bottom of the shaft. The bottom of the shaft had not been cleaned for at least about fourteen months. The janitor was never instructed by the appellants to clean this nor was appellee told by the appellants that the bottom of the shaft was a glass floor. The janitor had cleaned the shaft for a former owner. The bottom of the shaft had never been opened since appellee was a tenant there. The appellee said that the bottom of the shaft, four feet away, appeared to her to be solid. She had only looked down in the shaft. She had never been in the first floor apartment. Miss Miles, the third floor tenant, said that in looking down the shaft, she could not tell what material covered the bottom. It was natural to suppose that clothing might fall out of the hampers or the windows to the bottom of the shaft. No method was provided

by the landlord to retrieve these. The appellee found some of the furnishings of the apartment, supplied by the landlord, stored in the shaft when she moved in. From this she might have inferred that the bottom was solid and would hold her. The record does not show the size of the appellee but it was admitted in the argument that she was a small woman. This Court is of opinion that there was sufficient evidence of primary negligence on the part of the appellants to submit that question to the jury. We are further of opinion that there was not sufficient evidence of contributory negligence on the part of the appellee to rule as a matter of law that the case should be withdrawn from the jury.

This is not a case where the tenant rented the whole premises. In the case of *Smith v. State, to Use of Walsh*, 92 Md. 518, 48 A. 92, 51 L. R. A. 772, the tenant rented the whole house from the landlord, Smith. The child of a sub-tenant apparently fell through missing banisters on the porch and was killed. This Court held in that case that the landlord did not warrant the condition of the premises. As the tenant could inspect it the landlord was not answerable unless there was misrepresentation, active concealment, or total inability on the tenant's part to discover the defects before entering. It is said in Tiffany on Real Property, Volume 1, Page 102, "Since the tenant is bound to inspect beforehand, and is subject to the rule of *caveat emptor*, and the landlord owes no duty to repair, the latter is, in general, not liable for injuries to the tenant or his property resulting from the construction or condition of the demised premises. This rule is, however, subject to the exception referred to above, in regard to hidden defects existing at the time of the lease, of which the lessor, knowing thereof, is bound to inform the lessee."

In *Gray v. Elgutter*, 1926, 5 La. App. 315, the plaintiff was held a trespasser when, having been employed by two tenants to clean their apartments, she entered a vacant apartment that led to a skylight and she fell through the glass. In the case of *Culbreath v. M. Kutz Co.*, 1927,

37 Ga. App. 425, 140 S. E. 419, a window washer fell to the street when a window he was washing and using for support broke loose. The Court in sustaining demurrers to the petition held that the defendant was under no duty to construct or maintain windows in a safe condition for any but ordinary uses; that is, to admit air and light. Further that the danger was so obvious that a person of ordinary prudence would not have subjected himself thereto.

In the case of *Owners' Realty Co. v. Richardson,* 158 Md. 367, 148 A. 543, the plaintiff was injured in a self-operated elevator while visiting her employer, one of the tenants. This Court held in that case that the landlord was engaged in the carriage of its tenants and their servants and visitors by means of an automatic elevator, which was operated by those using it without any assistance, direction, or supervision of the landlord. This Court said further in that case 158 Md. at page 371, 148 A. at page 545, "It was an economical method to cast the burden of its operation upon those having occasion to go to and from the several apartments of the six-storied building, but the knowledge of the defendant that it would be run by a number of persons, who would represent a wide range of age, experience, intelligence, and capacity, cast upon the defendant all the more care in the selection and maintenance of the mechanical device which was adopted for this general service. The rule approved by this court is that the landlord engaged in transporting passengers by elevators must exercise great care not only in their operation but in providing safe and suitable equipment. It is a rule which has its sanction in sound public policy, which exacts a high degree of care where security of person and life is frequently involved, under circumstances in which the carrier is in control of the movement or of the equipment." Likewise in the instant case it was the duty of the landlord to furnish light and air to the apartment of the tenant. This shaft was an economical method of doing so, and in maintaining this shaft with windows opening into it

and with a bottom which appeared to the tenant to be solid, though made of glass, the landlord, being in control of the elevator shaft, was charged with a high degree of care for the security of the persons getting light and air from the shaft.

It is said in *Restatement on Torts, Negligence,* Section 360, "Parts of Land Retained in Lessor's Control Which Lessee is Entitled to Use": "A possessor of land, who leases a part thereof and retains in his own possession any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sub-lessee for bodily harm caused to them by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and *could have made the condition safe.*" (Italics ours.)

The case of *Bernstein v. Karr,* 22 N. J. Misc. 1, 34 A. 2d 651, also follows this doctrine where it is said, 34 A. 2d at page 653, "This doctrine is set forth in *Barthelmess v. Bergamo, supra,* 103 N. J. L. [397], at page 398, 135 A. at page 794, thus: 'The sole departure from the fundamental rules, except where the *locus in quo* was in essence a nuisance, *has been necessitated by the construction of tenement or apartment houses, intended for the habitation of many tenants,* in which situations differing entirely from any comprehended by the rural conditions of habitations at the common law, the courts have found it necessary to recognize the novel housing requisite incident to modern life, by treating hallways and stairs as common ways or appurtenances, kept and maintained by the landlord, for the purpose of affording reasonable entrances and exits to and from the demised premises; and for a failure to reasonably maintain which, in the event of damage to occupants and others lawfully using the premises, the landlord has by the general trend of authority been made liable.' " (Italics supplied here.)

It is further said at Section 360, *supra* paragraph (c):

"* * * The rule stated in this Section applies not only to the hall, stairs, elevators, and other approaches to the part of the land leased to the lessee as a flat, office or room in a tenement or boarding house, but also to such other parts of the land or building to the use of which by express or implied terms of the lease the lessee is entitled, usually in common with other lessees, such as a bathroom in a boarding house and the roof or yard of a tenement building or apartment house."

In *Dobbie v. Pacific Gas & Electric Co.*, 1928, 95 Cal. App. 781, 273 P. 630, the plaintiff, a sheet metal worker, sued for damages for injuries sustained while working for an independent contractor on the roof of defendant's gas generator plant when he fell through the skylight covered with several inches of soot and cinders and discharged by gas generators. It was alleged that the skylight was so covered that it could not be seen and presented the appearance of an ordinary roof and that the defendant, knowing that plaintiff would be working on the roof and that the skylight was unobservable, negligently failed to warn the plaintiff. It was held in that case in affirming judgment for plaintiff that, whether he was an invitee or licensee, was a question for the jury as well as issues of negligence and contributory negligence. Even if plaintiff's employer had known of the skylight the defendant was not released from his duty to warn the plaintiff. It is also said in the Restatement on Torts, Negligence, Section 361, "Part of Land Retained in Lessor's Control But Necessary to the Safe Use of the Part Leased":

"A possessor of land, who leases a part thereof and retains in his own control any other part which is necessary to the safe use of the leased part, is subject to liability to his Lessee and others lawfully upon the land with the consent of the Lessee or a sub-lessee for bodily harm caused to them by a dangerous condition upon that part of the land retained in the Lessor's control, if the Lessor by the exercise of reasonable care,

"(a) could have discovered the condition and the risk involved therein, and

"(b) could have made the condition safe."

This doctrine is affirmed in the case of *Ellis v. Mc-Neese,* 109 Cal. App. 667, 293 P. 854, where it is said 109 Cal. App. at page 670, 293 P. at page 853, "where a portion of the premises is reserved by the landlord for use in common by himself and tenants, or by different tenants, a duty is imposed upon him to use ordinary care to keep those particular portions of the premises in a safe condition; and if he is negligent in this regard, and a personal injury results to a tenant by reason thereof, he is liable therefor."

It was held in the case of *Lindsey v. Leighton,* 150 Mass. 285, 22 N. E. 901, at page 903, 15 Am. St. Rep. 199, "It was not necessary to show that the defendant [the landlord] had actual knowledge of the defect. His duty was that of due care; and ignorance of the defect was no defense."

In the case of *Masek v. Bubenheimer,* 1938, 229 Wis. 194, 281 N. W. 924, a rough edged pipe about eight inches above ground had been placed along a driveway to prevent the cars of the tenants from encroaching on the lawn by cutting the automobile tires if the cars so encroached. The Court held in that case that if the landlord was the possessor of the land and leased part of it and retained in his possession a part which the lessee was entitled to use as appurtenant to the part leased he ought reasonably to have foreseen that by so placing the pipe he would thereby expose the interest of others to an unreasonable risk of harm and if, by the exercise of reasonable care, the landlord could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe, he was subject to liability for bodily harm to the lessee and others lawfully on the land caused to them by this dangerous condition.

In the case of *Northern Trust Co. v. Elman,* 6 Cir., 72. F. 2d 169, whether appellant was negligent in failing to warn appellee of the danger in the floor of a show window in store-room leased by appellee was held to be a question

for the jury. The floor was made of glass and covered with linoleum, giving it the appearance of hard wood floor. Owner's agent, from whom the appellee rented, had knowledge of the dangerous condition.

The case at bar is not one of a patent defect as in the cases of *Fulton Building Company v. Stichel,* 135 Md. 542, 109 A. 434, or *Yaniger v. Calvert Building & Construction Co.* 183 Md. 285, 37 A. 2d 263.

The Baltimore City Code, Section 7664, offered in evidence in this case, provides "Protection of Sky-lights. Sky-lights glazed with plain glass, except over photographic studios, shall be protected on the outside by a wire screen. Sky-lights with plain glass located over passage-ways, stairways, restaurants, and places of public or private assembly, shall also be protected on the outside by a wire screen. * * *." As was pointed out by the trial judge in his charge to the jury, the violation of this ordinance alone, if the jury found it was violated, did not give rise to a cause of action for which the plaintiff could recover. She could recover only if the violation of the ordinance was the proximate cause of the accident. *Owings v. Jones,* 9 Md. 108; *Gordon Sleeprite Corp. v. Waters,* 165 Md. 354, 359, 168 A. 846.

This Court does not feel that the facts here were such that the trial judge should have ruled that the appellee was guilty of contributory negligence as a matter of law and thereby have taken the case from the jury. We think that the minds of ordinary men might differ as to whether the appellee was guilty of contributory negligence. *Edelman v. Monouydas,* 186 Md. 479, 47 A. 2d 41, 42. By placing the clothes hampers for the use of the tenant in the shaft the appellants invited the tenant to use this shaft for that purpose. In not providing anything to catch clothing which might fall out of the hampers, other than the bottom of the shaft, the appellants should have contemplated that what did happen in this case would happen. There is credible testimony that the bottom of the shaft was covered with dust and that appellee, looking down the shaft a distance of four

feet, thought the floor there was solid. Miss Miles testified that in looking down in the shaft from the third floor apartment she could not tell what material covered the bottom. The fact that the appellee found some of the articles of furnishings provided by the appellants in the shaft at the time she moved in the apartment might have led her to believe that the floor of the shaft was suitable for the storage of other articles and would bear her weight. The mere fact that Miss Hilton told her to "be careful, there might be some glass down there" would not make the appellee guilty of such contributory negligence as to take the case from the jury. The minds of ordinary men might think that she was careful in the way she moved around after she reached the bottom of the shaft. The jury saw the appellee on the witness stand and could judge her size and weight.

This Court has frequently said, as in the case of *Taxicab Co. of Baltimore v. Emanuel*, 125 Md. 246, at pages 259 and 260, 93 A. 807, at page 813, "The act relied on to establish, as a matter of law, the existence of contributory negligence must be distinct, prominent, and decisive, and one about which ordinary minds would not differ in declaring it to be negligent. Where the nature and attributes of an act relied on to show negligence contributing to an injury sustained can only be determined correctly by considering all the attending and surrounding circumstances of the transaction, it falls within the province of the jury to pass upon and characterize it, and it is not for the court to determine its equality as matter of law." *Merrifield v. Hoffberger Co.* 147 Md. 134, 137 and 138, 127 A. 500.

Appellee cross-appeals from the refusal of the trial judge to charge the jury that the salary lost by the appellee, due to this accident, and her medical expenses were proper items for them to consider in reaching the amount of their verdict. Appellants claim, as the appellee was a married woman living with her husband but temporarily separated because of his service with the Armed Forces, that the husband alone can sue for

these items.  As pointed out in the case of *Furstenburg v. Furstenburg,* 152 Md. 247, 136 A. 534, at common law the husband and wife were regarded as one and the wife was incapable of making contracts.  By the Act of 1898, Chapter 457, Code Article 45, Section 5, it is provided, "Married women shall have power to engage in any business, and to contract, whether engaged in business or not, and to sue upon their contracts, and also to sue for the recovery, security or protection of their property, and for torts committed against them, as fully as if they were unmarried; contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction."

In the case of *Furstenburg v. Furstenburg, supra,* it was pointed out that a practically identical federal statute applying to the District of Columbia was construed by the Supreme Court of the United States in a suit by a wife against her husband for assault and battery *(Thompson v. Thompson,* 218 U. S. 611, 31 S. Ct. 111, 54 L. Ed. 1180, 30 L. R. A., N. S., 1153, 21 Ann. Cas. 921), and it was there held that the statute did not authorize that action.  This Court said however in that case, 152 Md. at pages 251 and 252, 136 A. at page 535, "The District of Columbia statute provides that married women shall have power to sue 'separately' for torts committed against them, while the Maryland statute does not use the word 'separately' in that connection.  But the specific intent to empower the wife to maintain a separate suit is clearly manifest.  By implied reference the very term just quoted is applied to the wife's right of action, when the next clause provides that she 'may also

be sued separately,' for wrongs independent of contract." This is a definite statement therefore that the wife may maintain a separate suit for torts committed against her and the statute plainly says that she may sue separately upon her contract.

In *Farver v. Pickett,* 162 Md. 10, 11, 158 A. 29, decided January 14, 1932, the wife's will provided for the payment of all her just debts and funeral expenses. In an administration account filed by the surviving husband as administrator, *c.t.a.,* the husband took credit for the payment of funeral expenses of the testatrix, a grocery bill furnished on her order, and a doctor's bill, among other things. These items were disputed by other heirs. This Court held in that case that as a married woman is legally capable of contracting debts on her individual responsibility, the husband is not liable for a debt contracted upon the wife's sole credit and that the creation of an exclusive liability on the part of the wife may be expressed or implied. In that case the Court found that the evidence sufficiently proved that either expressly or impliedly the testatrix alone was given credit and assumed the obligation represented by the claims for medical service and food supplies and these items were allowed.

In the instant case the appellee made a proffer. The Court said, "Let the record show that counsel for the plaintiff offered to prove medical expenses and salary loss. The Court declines to let the jury have that evidence. * * *" Under the authority of the case of *Farver v. Pickett, supra,* if it can be shown that the wife either expressly or impliedly assumed the obligation for the medical expenses or has paid for them, she should in her own name be allowed to recover for those items.

In *Neudecker v. Leister,* 132 Md. 571, 104 A. 47, the wife alone sued the executrix of her aunt's will for board, lodging, and personal services rendered the deceased in the home where plaintiff lived with her husband. The objection was raised that this claim could only be asserted by the plaintiff's husband. This Court held that,

as the services were rendered with the husband's consent for a promised consideration with the understanding that she should receive the consideration separately, the wife, under Article 45, Section 5, *supra,* should be permitted to maintain the suit. In the instant case the services were not rendered in the home but entirely separate and apart therefrom.

In 151 *A. L. R.* at pages 502-505, the question here before us is extensively reviewed and it is there stated that, although at common law the earnings of a wife acquired in a separate business or received for services to persons other than her husband, belonged to the husband and he alone could recover for loss thereof because of personal injuries to her, the married women's statutes have placed her in the same position as a man to recover for services, such as those in the instant case, in her individual capacity and the husband's consent to the wife engaging in separate business or employment is not a condition precedent. This seems to be the modern trend of a majority of the courts.

In *Riley v. Lidtke,* 49 Neb. 139, 68 N. W. 356, the wife performed services as a laundress and seamstress for others than her family. The Court there held that these earnings were her sole and separate property and that her husband could not sue for those earnings which the wife lost as a result of an accident. The Court further held in that case that the law presumes that a wife performs the duties and renders the services toward her family which grow out of the marriage relation and that she will continue to do so. In *Nelson v. Metropolitan St. R. Co.,* 113 Mo. App. 659, 88 S. W. 781, it was held that while the husband was entitled to damages for loss of the wife's services in connection with her household duties, he was not entitled to recover damages for any loss arising from her inability to pursue her separate vocation, since the right to recover thereof was in the wife alone. See also *Hendricks v. St. Louis Transit Co.,* 124 Mo. App 157, 101 S. W. 675; *Texas & P. R. Co. v. Humble,* 181 U. S. 57, 21 S. Ct. 526, 45 L. Ed. 747; *Healey*

*v. P. Ballantine & Sons,* 66 N. J. L. 339, 49 A. 511; *Harmon v. Old Colony R. Co.,* 165 Mass. 100, 42 N. E. 505, 30 L. R. A. 658, 52 Am. St. Rep. 499. To the contrary see *Georgia Railroad & Banking Co. v. Tice,* 124 Ga. 459, 52 S. E. 916, 4 Ann. Cas. 200.

The best rule seems to be that under the married women's act the wife has been placed on the same footing as her husband with respect to her property and personal rights. It is the duty of the husband to support his family. The wife owes the husband her services in caring for the household. Her services and work in caring for the household belong to the husband to compensate for his support and protection. When the wife has taken upon her shoulders all or part of the husband's burden and enters into a separate business or employment, the law presumes that the wife performs the duties and renders the services toward her family growing out of the marriage relation. The money she receives for work outside of the household therefore belongs to her.

It must be borne in mind that the earnings of the appellee as a stenographer were earnings which she made·outside of the home and had no relation to her duties there. As above set forth, under the married women's act, Article 45, Section 5, *supra,* the wife was given power to contract and therefore had the right to enter alone into the contract of employment and as specifically set out in the quotation *supra* from the case of *Furstenburg v. Furstenburg,* she could sue separately for wrongs independently of contract. We are therefore of opinion that the appellee in this case should be allowed to prove her loss of earnings as an item of damage in this case.

There is no difficulty in this case in separating the claim for medical services given on the wife's credit alone or paid by her alone, nor in proving her loss of earnings by reason of this accident. It is provided by Code, Article 5, Section 25, "If it appears to the Court of Appeals that a reversible error affects a severable item or part only of the matters in controversy, the Court may direct final

judgment as to the remaining parts or items thereof, and may direct a new trial as to the said severable part or item only." In pursuance of this provision since the question of liability of the defendants to the plaintiff for negligence has been established the judgment will be reversed only for the purpose of allowing appellee to prove loss of earnings and medical expenses as above set forth, as to which a new trial will be awarded. As to the judgment of $1,000, it will be affirmed and directed to be finally entered. *Bucher v. Federal Baseball Club*, 130 Md. 635, 644, 101 A. 534.

> *Judgment affirmed in part and reversed in part and new trial awarded. The appellants to pay the costs.*

MARBURY, C. J. filed the following dissenting opinion.

Appellee rented the second floor rear apartment at 811 North Charles Street, Baltimore, furnished, from the appellants, on March 7, 1945. In this apartment was a small dressing room which had a window in it leading to a light and air shaft which extended up to the third floor and down to the ceiling of the first floor. The bottom of the shaft was a three pane window in the ceiling which could be opened by means of a pulley by the occupant of the first floor apartment. In this shaft, on the outside of each of the windows leading to it from the third floor and from the second floor, were small soiled clothes hampers. The appellee received certain household articles under her lease, among them a long-handled brush and some other things which she did not remember, which she found were outside of the window and down in the shaft. There is no evidence as to how they got there, nor that they were usually kept there, and she removed them and put them in the kitchen with her other household utensils. She used the hamper for her soiled clothes from time to time. On July 6th, after appellee had been in the apartment for four months,

two girls who occupied the apartment above her, came to her apartment and said they had dropped some articles of laundry down in the shaft and asked if they could get them. The three of them went into the dressing room and looked down and saw the articles. The appellee was cleaning up her apartment and was not dressed, while the other parties had on good clothes. So appellee volunteered to get down into the shaft. She sat on the window sill, which was three feet three inches above the floor, and turned her feet around and let herself down in the shaft, picked up an article on the right-hand side of the hamper and handed it to one of her visitors. She was then told there was another article on the left. She moved her feet to get to the left side and the bottom of the shaft went through and she landed on the floor of the first floor apartment and suffered injuries for which she sued the appellants. The bottom of the shaft had not been cleaned and, according to appellee's testimony, when she had looked down it at other times it appeared to be solid floor. One of the visitors warned the appellee not to get into the shaft, that there might be glass there. Appellee said that she assumed that the warning was concerned with some pieces of glass and not that there was a glass bottom to the shaft.

On these facts the majority of the Court hold that there was sufficient evidence of negligence on the part of appellants to take the case to the jury and that reasonable men could differ as to whether the appellee was guilty of contributory negligence, and, therefore, this question was also properly left to the jury. I am unable to concur in these conclusions.

In my opinion it is carrying the duty of a landlord, who rents furnished apartments, very far to say that he is responsible either for not providing a solid floor for an air shaft or for not notifying his tenants that the bottom of the air shaft was made of glass and would not bear the weight of a person. Tenants are not supposed to climb through windows and walk around in the bottom of air shafts. The window was obviously not for the

purpose of ingress, but was there for ventilation. The fact that it was a window and not a door should show any one that it was not intended as an entrance. Nor am I impressed with the suggestion that since clothes hampers were fastened to the outside of these windows and in the shaft, it would be inevitable that sooner or later some articles would be dropped. There are other ways of retrieving such articles than that adopted by the appellee. The janitor or the owner could have been called. The bottom of the shaft could have been opened by the pulley provided for that purpose. The bottom of an air shaft is not intended as a footway. The duty of a landlord is to keep safe all parts of the rented premises for the ordinary and proper use of the tenants. But it seems to me it is an unwarranted extension of this duty to require him to keep the bottom of an air shaft in condition for tenants to walk upon at will. And if they do, an ordinary mind would conclude that their own negligence contributed to the happening of any accident which might result.

I think the judgment should be reversed without a new trial.