McDONALD, ET AL. *v.* BURGESS, ET UX.

[No. 354, September Term, 1968.]

*Decided July 1, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SMITH, JJ.

*William L. Kaplan,* with whom were *Karl G. Feissner, Thomas P. Smith* and *Feisner, Kaplan & Smith* on the brief, for appellants.

*Hugh L. Reilly,* with whom was *Edward C. Bell* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

This case arises from an unfortunate incident in which an eight year old boy lost part of an ear.

In July of 1967 plaintiffs-appellants, Mark McDonald ("the boy") and his mother, Mrs. Ann Drouillard ("the mother"), were visiting long time friends, defendants-appellees, Coy R. Burgess (Burgess) and his wife. Burgess owned two German shepherd dogs. When Burgess went to feed the dogs, the boy accompanied him to the 30 foot by 50 foot run where the dogs were kept. The boy was injured in the pen. This suit was brought alleging in a single count:

"[T]hat at said time and place the Defendants in a negligent manner allowed their [G]erman shep[he]rd dog to severely bite and maul the minor Plaintiff. That the Defendants were negligent in taking the minor Plaintiff to watch and/or assist in the feeding of the said [G]erman shep[he]rd dog, when the Defendants knew or should have known that dogs of this nature tend to be violent and oppressive when children or any person is near the area in which they are eating.

"That in addition thereto the Defendant[s] knew or should have known of the dangerous propensities of their dog and that they failed to take reasonable steps to prevent said animal from attacking and mauling the minor Plaintiff named herein.

"In addition thereto the Defendants committed other acts of negligence all of which have proximately caused the severe permanent injuries to the minor Plaintiff and have caused the adult Plaintiff, his mother, to suffer and to in the future suffer loss of services of the minor

Plaintiff. The Plaintiffs were in the exercise of due care."

Upon motion of the defendants, summary judgment was entered in their favor. We shall affirm that action.

The remedy of summary judgment pursuant to Maryland Rule 610 a is proper only where there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. *Horst v. Kraft,* 247 Md. 455, 458, 231 A. 2d 674 (1967), and *Owens v. Simon,* 245 Md. 404, 407, 226 A. 2d 548 (1967). As was said by Judge Niles for this Court in *Tellez v. Canton Railroad Co.,* 212 Md. 423, 430, 129 A. 2d 809 (1957), "The function of the summary judgment procedure is not to try the case or to decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly." Where different inferences may be drawn from undisputed facts, the party against whom the inferences are sought to be drawn is entitled to the inferences more favorable to his contentions. *White v. Friel,* 210 Md. 274, 285, 123 A. 2d 303 (1956), and *Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 14, 155 A. 2d 691 (1959).

The undisputed facts, other than previously stated, which may be gleaned from the record are: The precise cause of the boy's injury is not known. The boy said with reference to the dog "Mike", "[I]t seems like he did get up on my shoulder, but he didn't snap at me or anything." The boy reiterated that the dog did not bite him, although he remembered that the dog's paws were up on his shoulders. The mother testified that she looked out of the side window in the Burgess kitchen. She saw the dog's paws on the boy's shoulders. The boy and the dog were close to the fence. She did not know whether the boy was against the fence. She saw the dog's paws, but did not see the dog. She did not see the dog pawing at the boy. She did not see the dog bite the boy. After this incident she said:

"Mark turned around to the window and he

had a real funny look on his face, and I noticed something had happened, and I went running out of the house, and [Mrs. Burgess] was right behind me and Mark was coming out and, when he saw me, he started to run to meet me and he started crying then. I don't know how far away he was from me then. I can't remember, but I saw blood on him and I looked for something to wipe it with and there was his sweat shirt on the stoop that Mrs. Burgess gave me. I didn't know the blood was from his ear. I had no idea it was his ear, but there was a lot of blood and Randy said, 'Let's get him to a doctor.' "

Burgess was asked the question, "When did the biting take place?", to which he replied:

"There was no biting as far as I know because they were playing. I noticed them kind of romping like a dog and a boy will do, but I never seen any biting. Now whether he got him with a claw or he did get him with a tooth, I can't tell you."

They were about three or four feet outside of the gate before either Burgess or the boy noticed any blood on the boy and Burgess didn't know that any portion of the ear was missing until they were at the doctor's office. He stated unequivocally that the boy was not attacked by any dog. Thereafter, the record on deposition is as follows:

"Q. * * * To your knowledge, is there anything, other than the dog, that would have caused him to lose a portion of his ear? Did he cut himself on the fence or take a knife and do it? A. I don't think he took a knife, but we have a doghouse which he could have fallen against.

"Q. Did you see him fall? A. No, and we have a fence, but I can't say definitely that the dog did it. I can't say that.

"Q. Do you know that anything else did it?
A. I don't know.

"Q. Did you see him fall against the fence?
A. No, I didn't.

"Q. Did you see him fall against the dog-house? A. No.

"Q. Did you see him fall against any object whatsoever? A. No.

"Q. As far as you know, did the boy ever leave his feet? A. No.

"Q. To your knowledge, had [the dog] ever bitten anyone before, any person? A. A human being, no.

"Q. Had he ever bitten another animal before? A. Now I can't say definitely, but no domestic animal that I know of.

"Q. How about undomestic? A. I can't say, but we have a lot of wild animals running around there, but I would say no."

In response to defendant's interrogatories the mother conceded that she did not know of anyone's having been bitten by the animal in question prior to the incident in this case.

The Maryland rule of liability was stated by Judge (now Chief Judge) Hammond for this Court in *Herbert v. Ziegler*, 216 Md. 212, 139 A. 2d 699 (1958) :

"To hold liable the owner of a domestic animal that has caused injury, the claimant must show that the owner knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm. *Twigg v. Ryland*, 62 Md. 380, 386 [1884] ; and *May Co. v. Drury* [160 Md. 143, 153 Atl. 61 (1931)], *Evans v. Upmier* [16 N.W. 2d 6 (Ia. 1944)] and *Lynch v. Richardson*, [39 N.E. 801 (Mass. 1895)], all *supra; Prosser,*

*Torts* (2d ed.), Sec. 57, pp. 323-325; *Restatement, Torts,* Sec. 518." *Id.* at 216.

The aforegoing was quoted verbatim in *Finneran v. Wood,* 249 Md. 643, 648, 241 A. 2d 579 (1968). See also *Hamilton v. Smith,* 242 Md. 599, 219 A. 2d 783 (1966).

It is an undisputed fact that Burgess did not know of any prior attacks by this dog or any demonstration of a vicious propensity. To this point the boy and his mother state that in *Bachman v. Clark,* 128 Md. 245, 97 A. 440 (1916), our predecessors allowed for injuries received by dog bite without any evidence that the dog had actually bitten people before, holding that evidence showing that the dog had growled at people prior to the incident "* * * was legally sufficient to go to the jury * * * to show that the dog had a propensity or inclination to bite mankind * * *", and calling our attention also to *Goode v. Martin,* 57 Md. 606 (1882). In *Bachman v. Clark, supra,* Judge Pattison for the Court said:

> "It must first be shown, in order to render the owner liable for damages to one bitten by his dog, that the dog had a vicious propensity, and second that such vicious propensity or inclination was known to its owner. But the owner's knowledge of the dog's vicious propensity need only be such as to put him on his guard and to require him as an ordinary prudent person to anticipate the act or conduct of the dog resulting in the injury for which the owner is sought to be held liable. 3 C.J. 96. The owner's knowledge of the propensity of the dog may be, and most generally is, acquired from its conduct and behavior, although such knowledge may be acquired from other persons, and in some cases the knowledge of others is imputed to the owner." *Id.* at 248.

On that premise, where there was evidence that the dog was always kept in an enclosure; that the dog would

jump on people entering the enclosure; that the dog would become excited, bark and run up and down the fence, attempting to bite a stick thrust between the palings by boys upon the outside; that the dog would growl; and that the dog was always kept within the enclosure except when on a strap, our predecessors did hold there was legally sufficient evidence to go to the jury as tending to show the defendant's knowledge of the dog's vicious propensity or inclination to bite mankind. In *Goode v. Martin, supra,* our predecessors held the defendant might be presumed to have had knowledge that his dogs were fierce and dangerous from the fact that he was accustomed to keep them tied during the daytime. These cases certainly are not authority for the proposition suggested by the boy and his mother that it is not essential to establish facts which could put an owner on notice of the potentially vicious propensity of his animal. The fact that the dogs here were kept in an enclosure in a suburban area in a day when legal restrictions frequently forbid a dog's running at large cannot have the same significance that the matter of enclosure had in 1916 and 1882.

The boy and mother claimed that they do not here rely entirely upon the line of cases dealing with "vicious" propensities but that Burgess was negligent when he took the boy into a place of danger because of the "dangerous" propensities of the dog. They had filed an affidavit from an officer of the Prince George's County police department with long time experience in the "K 9 Corps" that this "breed of dog can and often does behave in a very vicious manner; that this breed of dog can and will act in a vicious manner if in any way disturbed while eating" and "that the owner of such an animal knows or should know of the potential dangerous propensities of this breed of dog and that such animal should not be disturbed while eating; that if such disturbance does occur, the animal will likely attack in some manner the person disturbing it, particularly if that person is not the dog's master."

Our predecessors in *May Co. v. Drury,* 160 Md. 143,

153 A. 61 (1931), considered a somewhat analogous claim. There a customer of a pet shop was bitten by an uncaged parrot. Judge (later Chief Judge) Sloan there said for the Court:

> "The only evidence tending to show that it was vicious came from the defendant's witnesses. Harry F. Crouch, on cross-examination, was asked, 'Had any parrot at all ever molested any one in that store?' and answered, 'The only person I know was the man that had charge of the pet shop in taking the parrots out of the cage when they were shipped from Texas sometimes putting his hand down, a strange parrot * * * might nip his finger.' He then stated that this parrot was shipped from Texas. This evidence is too far fetched to prove the *scienter* of the defendant. Adopting the view that the offending parrot was a domesticated or tamed bird, it is necessary for the plaintiff to show that it was possessed of a vicious propensity, and that the defendant knew of it or had reason for believing that it was not safe to let it run or fly at large in the store or shop." *Id.* at 147-48.

Judgment in favor of the plaintiff was affirmed in that case, however, on the strength of *Goode v. Martin, supra,* since the evidence was that the birds were kept caged except when their cages were being cleaned, and they then warned customers away from the birds. The Court said:

> "If they felt this way about it, the parrots should not have been allowed within reach of the customers. Nothing but the fear of consequences such as we have here could have inspired those having charge of the parrots to warn customers to stay away from them." *Id.* at 149.

In *Twigg v. Ryland,* 62 Md. 380 (1884), Chief Judge Alvey said for the Court:

> "The owner or keeper of the dog or other do-

mestic animal must be shown to have had knowledge of its disposition to commit such injury, and the burden of proving this fact is on the plaintiff, though it would be otherwise if the animal was of a nature to be fierce and untamable, such as bears, tigers, etc. *Spring Co. v. Edgar,* 99 U. S. 645. *The notice which will charge the owner or keeper with liability for the vicious conduct of the animal must be notice that it was inclined to do the particular mischief that has been done.* Hence, notice that a dog is ferociously disposed towards cattle, is no notice that he will attack persons. It is not necessary to show that the owner or keeper of a vicious dog has seen the animal attack mankind; but it is sufficient to show that the vicious propensity of the animal has, in some way, been brought to the knowledge of the owner or keeper, so as to admonish him to take the necessary precaution to prevent injury in the future. Hence the question in each case is whether the notice was sufficient to put the owner or keeper on his guard, and to require him to anticipate the injury that has actually been done." *Id.* at 385-86. (emphasis added)

Actually, there appears to be nothing to show that the injuries to the boy came from an attack by the dog. Assuming, *arguendo,* that the dog was responsible, we agree with the trial court where it stated:

"The Court does not accept the theory that because a German shepherd dog 'can and often does behave in a very vicious manner' an owner of a *particular* German shepherd dog knows or should know that his dog possesses these tendencies. There is nothing in the record to demonstrate that the particular dog alleged to have caused the injury herein was of a violent or oppressive nature."

The boy and his mother, in addition, assert that the trial court erred in making a ruling, without taking into consideration the points raised by their request for admission of facts, which they contend are deemed admitted because they were unanswered. Assuming, without deciding, that these points were to be considered by the trial judge in arriving at his decision, the result would not be different, since none of the points raised establishes or deals with the requisite *scienter* on the part of the defendant.

Summary judgment was properly entered for the defendants.

*Judgment affirmed; appellants
to pay the costs.*