714 A.2d 881

**Kimberly SHIELDS et al.**

v.

**Arthur WAGMAN et al.**

**No. 109, Sept. Term, 1997.**

Court of Appeals of Maryland.

Aug. 6, 1998.

Aaron M. Levine (Law Offices of Aaron M. Levine, on brief), Washington, DC, for Petitioners.

Mark D. Palmer, Lanham, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

In the instant case, we are called upon to determine whether a landlord of commercial property may be held liable for

injuries sustained in the common area and caused by an American Pit Bull Terrier (pit bull) kept on the leased premises by one of the tenants where the landlord had knowledge of the potential danger and the ability to rid the premises of that danger by refusing to re-let the premises. We hold that, under the circumstances of this case, there was a duty by which the landlord may be held liable for the injuries sustained by the Petitioners.

## I.

Because this case comes to us on an appeal from the granting of Respondent's motion for judgment, we must look at the facts in the light most favorable to the non-moving party, Petitioners. *See, e.g., Martens Chevrolet v. Seney*, 292 Md. 328, 331, 439 A.2d 534, 536 (1982). This appeal arises out of two cases consolidated for trial seeking damages from the landlords of a strip mall for injuries sustained by two individuals, a business invitee and a tenant, as a result of being attacked by a pit bull owned by another tenant and kept on the leased premises.

Arthur Wagman, Lynn Wagman, Ernest Young, Marian Young, and Kenneth Zawatsky were partners in Hampton–Edgeworth Joint Venture (Joint Venture or Respondents, collectively).[1] Joint Venture owned a commercial strip mall, leased primarily by automobile repair shops, in Capitol Heights, Maryland. The strip mall contained eight bays, each with an office area. At all times relevant to the instant case, Arthur Wagman (Wagman) served as the managing or leasing agent for the property and was, thus, "in charge of the property" for the partnership.

---

1. While there was some question about the nature of the business entity, Respondents admitted the partnership in their opening statement at trial before the Circuit Court for Prince George's County. Moreover, Kenneth Zawatsky, one of the partners, testified about the policy of the "partnership" with respect to the strip mall. Zawatsky also testified that Wagman was the managing agent for the partnership for the strip mall.

One of the bays was leased to David Thomas (Thomas) who operated an automobile repair shop. Thomas leased the premises pursuant to a written lease; however, that lease had expired prior to the attacks that led to the instant case, and Thomas remained as a month-to-month tenant. Thomas owned three pit bull dogs which he kept on the leased premises. One of these pit bulls was named "Trouble." Trouble was acquired by Thomas in 1991 or 1992 and lived on premises, i.e., did not go home at night with Thomas. Testimony at trial suggests that Thomas generally kept Trouble in a cage that appeared to be made of chicken wire during the day except when Thomas took Trouble and the other dogs for a run twice a day or on limited occasions when Trouble was chained to Thomas's truck. At night, Trouble was allowed to run loose in the shop. There was also testimony that at times Thomas let Trouble run loose in the office during the day when the office was open to the public. On at least two occasions Trouble was permitted to run free in the parking area of the strip mall.

Petitioner M. Bernard Johnson operated an auto repair shop a block away from Thomas's shop from February 1987 to December 1993. At that point Johnson moved his shop to the strip mall owned by Respondents, and in February 1994, he began leasing one of the bays, thereby becoming one of Respondents' tenants. Prior to moving his shop to Respondents' strip mall, Johnson visited Thomas's shop once or twice a week to borrow tools. Johnson testified that he had seen Trouble, who Johnson characterized as "very vicious," at the strip mall as early as 1991. There was testimony at trial that, from the time Johnson moved to the strip mall, Johnson and Wagman frequently discussed Trouble's viciousness and the possible threat Trouble's presence posed. Moreover, there is some evidence that, as a result of this concern, Wagman warned Thomas to get Trouble off the premises or he would have to evict him.

Early in the morning of August 28, 1993, Petitioner Kimberly Shields went to the strip mall to drop her car off to be

repaired by Thomas. When she arrived, Thomas's office was shut and locked. Because she saw Thomas's truck parked outside, she went over to the door and peered in the window. Thomas, who was on the phone at the time, signaled for her to wait a minute. Inside, Shields could also see two dogs, one of which was Trouble who was not caged or leashed at the time. Trouble immediately jumped up, turned around, and started barking. Alarmed, Shields tried to return to her car, but before she could get there Trouble lunged twice at the door. With the second lunge, Trouble burst through the door and attacked Shields, locking onto her calf. Thomas came out of the store and tried to pull Trouble off Shields, eventually succeeding in prying the dog away. Shields was then taken to the hospital. Following the attack, Shields underwent emergency surgery and remained in the hospital for a week, later returned to the hospital for additional surgical procedures including skin grafting, and missed four months of work. As a result, Shields filed suit on November 26, 1993, claiming that both Thomas and Wagman, as the landlord, were negligent and thereby caused Shields to "sustain[ ] severe and permanent personal injuries, incur[ ] medical expenses, and ... be required to expend sums for loss of wages, and [that Shields] was prevented from pursuing her ordinary activities." Wagman was served with the Shields complaint on December 10, 1993.[2]

On January 30, 1995, Johnson was attacked by Trouble in the parking lot of the strip mall. At about 11 p.m. that night, Johnson was accompanying one of his customers to pick up her car when he heard a noise and noticed Trouble coming towards him. To escape, Johnson jumped on the hood of a

---

2. Although Shields's original complaint named only Thomas (individually and trading as Master Care Automotive) and Arthur Wagman, Shields later amended her complaint to add Louie Thomas, Eula Thomas, Lynn Wagman, as well as the following, both individually and trading as Hampton–Edgeworth Joint Venture: Arthur and Lynn Wagman, Ernest and Marian Young, and Zenneth Zawatsky. Louie Thomas and Eula Thomas were dismissed from the action, and Shields's complaint against Thomas was dismissed at the start of trial.

van parked in the parking lot. Trouble chased him onto the roof of the van and onto the hood of another car. At that point, Trouble locked onto Johnson's arm. Thomas came over, and together Thomas and Johnson beat Trouble until finally Trouble released Johnson's arm, but not before his arm had been torn open. As a result of his injuries, Johnson underwent several surgeries, lost sensation in his arm, and was impaired in his ability to do some aspects of his job.

On May 22, 1995, Johnson filed suit against Respondents, under both negligence and strict liability theories, claiming that Johnson "sustained severe and permanent personal injuries, incurred medical expenses, and will be required to expend sums for loss of wages, and was prevented from pursuing [his] ordinary activities." Johnson's case was later consolidated with the Shields case for trial before the Circuit Court for Prince George's County on January 16, 1996. At the close of the Petitioners' case, Respondents moved for judgment, and the court granted their motion, concluding that "the landlord owes no special duty to the invited public into the leased premises." Petitioners appealed to the Court of Special Appeals which affirmed. We shall reverse.

## II.

As with other types of negligence, to sustain a cause of action against a landlord for injuries resulting from an attack by a tenant's vicious dog, the plaintiff must prove: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached the duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" See BG & E v. Flippo, 348 Md. 680, 700, 705 A.2d 1144, 1153–54 (1998)(quoting Rosenblatt v. Exxon, 335 Md. 58, 76, 642 A.2d 180, 188 (1994)). At issue in the instant case is the first element, i.e., whether, under the circumstances, the landlord had a duty by which the landlord may be held liable for injuries sustained by the Petitioners.

One relationship that courts have found may justify the imposition of a duty to act affirmatively is the relationship

between the possessor of property and one who comes onto the property. Whether an affirmative duty is owed generally depends upon the person's status on the property. *See Flippo,* 348 Md. at 688, 705 A.2d at 1148. For example, "[t]he owner must use reasonable and ordinary care to keep his premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which [an] invitee, by exercising ordinary care for his own safety, will not discover." *Bramble v. Thompson,* 264 Md. 518, 521, 287 A.2d 265, 267 (1972); *see also Flippo,* 348 Md. at 688–89, 705 A.2d at 1148. Whereas, with respect to a trespasser, no affirmative duty is owed except "to refrain from willfully or wantonly injuring the" trespasser. *Bramble,* 264 Md. at 522, 287 A.2d at 267; *see also Flippo,* 348 Md. at 689, 705 A.2d at 1148.

"[W]hen the owner has parted with his control," *i.e.,* has leased the premises to a tenant, we have held that "the tenant has the burden of the proper keeping of the premises." *Marshall v. Price,* 162 Md. 687, 689, 161 A. 172, 172 (1932). Where the owner maintains control, however, the owner may be held liable for injuries. The injuries in the case *sub judice* were sustained in the common area of a strip mall. This Court has long recognized that in common areas the relationship between a landlord and one who comes on the land may justify the imposition of a duty to use reasonable care and diligence, in part, because the landlord generally retains control over common areas. *Landay v. Cohn,* 220 Md. 24, 27, 150 A.2d 739, 740 (1959); *McKenzie v. Egge,* 207 Md. 1, 7, 113 A.2d 95, 97–98 (1955); *see also Ross v. Belzer,* 199 Md. 187, 190, 85 A.2d 799, 800 (1952). Because the injuries in the instant case occurred in the common area, we need not decide what liability might have been imposed had the injuries occurred inside the leased premises where Maryland law is less settled.

MARYLAND CASES REGARDING COMMON AREAS

"[W]here a landlord leases separate portions of his property to different tenants and reserves under his control

the passageways and stairways, and other parts of the property for the common use of all the tenants[,] he must then exercise ordinary care and diligence to maintain the retained portions in a reasonably safe condition." [3] *Langley Park Apts. v. Lund Adm'r*, 234 Md. 402, 407, 199 A.2d 620, 623 (1964). Our recognition of landlord liability in common areas is generally premised on the control a landlord maintains over the common areas. This duty stems in part "from the responsibility engendered in the landlord by his having extended an invitation, express or implied, to use the portion of the property retained by him." *Landay*, 220 Md. at 27, 150 A.2d at 741. This common area exception has been recognized in multi-unit residential facilities:

" ' "[*Where* ] *the construction of tenement or apartment houses, intended for the habitation of many tenants,* ... which situations differ[ed] entirely from any comprehended by the rural conditions of habitations at the common law, the courts have found it necessary to recognize the novel housing requisite incident to modern life, by treating hallways and stairs as common ways or appurtenances, kept and maintained by the landlord, for the purpose of affording reasonable entrances and exits to and from the demised premises; and for a failure to reasonably maintain which, in the event of damage to occupants and others lawfully using the premises, the landlord has by the general trend of authority been made liable." ' (Italics supplied here)."

---

**3.** Our view of landlord liability for injuries occurring in common areas is consistent with RESTATEMENT (SECOND) OF TORTS § 360 (1965), which states:

"A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."

*See also Macke Laundry Serv. Co. v. Weber,* 267 Md. 426, 435, 298 A.2d 27, 32 (1972) (adopting the RESTATEMENT (SECOND) OF TORTS § 360

*Sezzin v. Stark,* 187 Md. 241, 250, 49 A.2d 742, 746 (1946)(quoting with approval *Bernstein v. Karr,* 22 N.J. Misc. 1, 34 A.2d 651, 653 (Cir.Ct.1943), in turn quoting *Barthelmess v. Bergamo,* 103 N.J.L. 397, 135 A. 794, 794 (1927)). This rationale is also applicable where the premises are leased for business purposes.

This Court, thus, has sustained landlord liability for injuries that occur in common areas within the landlord's control where it can be shown that the landlord knew or had reason to know the danger existed. *See, e.g., Macke Laundry Serv. Co. v. Weber,* 267 Md. 426, 432–33, 298 A.2d 27, 31 (1972) (holding landlord liable for injuries sustained by child of tenant in apartment complex's laundry room); *Langley Park Apts.,* 234 Md. at 410, 199 A.2d at 624 (holding landlord liable for injuries sustained by tenant resulting from accumulation of snow on a common approach to multiple family dwellings); *see also Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976) (noting in a certified question case that a landlord may be liable for tenant's death resulting from criminal activity that occurred in apartment's underground parking garage).

For example, in *Langley Park Apts., supra,* a tenant sued her landlord for injuries sustained when she slipped and fell on a patch of ice in the common area of a large scale multiple housing development owned by the defendant. After reviewing a variety of approaches taken in other jurisdictions, including one in which there was "no duty on the part of the landlord ... to remove from the [common area] the snow which naturally accumulated thereon," this Court held that the "accumulation of ice or snow upon the common approaches to tenement houses or multi-family apartment buildings may result in imposing on the landlord liability for injuries due to it." *Langley Park Apts.,* 234 Md. at 405, 410, 199 A.2d at 612, 624. We specifically limited this potential liability to situations where the landlord "knew, or in the exercise of reasonable care should have known, of the existence of a dangerous condition and failed to act within a reasonable time thereafter to protect against injury by reason of it." *Langley Park Apts.,* 234 Md. at 410, 199 A.2d at 624.

approach); *Sezzin v. Stark,* 187 Md. 241, 250, 49 A.2d 742, 746 (1946)(same).

In *Windsor v. Goldscheider,* 248 Md. 220, 221, 236 A.2d 16, 17 (1967), we reversed a granting of a directed verdict in favor of the defendant/landlord where the tenant was cut when he grabbed the top of a fence which ran along a path between the street and the apartment complex. In remanding the case for a new trial, we noted that

"[i]t is settled in Maryland that the mere ownership of land does not render one liable for injuries sustained by persons entering thereon, but where a landlord leases separate portions of his property to different tenants and reserves other parts of the property for the common use of all tenants, he must then exercise ordinary care and diligence to maintain the retained portions in a reasonably safe condition."

*Windsor,* 248 Md. at 222, 236 A.2d at 17.

Similarly, in *Macke,* a three-year-old boy was severely injured in the laundry room of the apartment complex where he lived when he put his hand into the drive mechanism in the back of a clothes dryer in an attempt to stop it. 267 Md. at 427–28, 298 A.2d at 28. The child and his mother brought suit claiming that the owner of the dryer and the manager of the complex failed to replace a guard which normally shielded the drive mechanism. *Macke,* 267 Md. at 427, 433–34, 298 A.2d at 28, 31–32. This Court affirmed a jury verdict in favor of the plaintiffs because, *inter alia,* "when a landlord sets aside areas for the use of his tenants in common, he owes a duty of reasonable and ordinary care to keep the premises safe for his invitees." *Macke,* 267 Md. at 429, 298 A.2d at 29.

Likewise, in *Scott,* a case that came to us as a certified question from the United States District Court for the District of Maryland, the plaintiff's decedent, a tenant in the defendant/landlord's apartment complex, was shot to death in the apartment complex's underground parking garage. 278 Md. at 162, 359 A.2d at 550. The plaintiff sued the landlord claiming that the landlord's failure to provide adequate security proximately caused the decedent's death. In answering the questions certified to us, we first held that, just as "a private

person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship," a landlord has no special duty to protect tenants from the criminal acts of third parties on the landlord's premises. *Scott,* 278 Md. at 168, 359 A.2d at 552. We then addressed whether a duty arose where defendant had knowledge of increasing criminal activity on the premises. *Scott,* 278 Md. at 166, 359 A.2d at 552. We noted that "a landlord who has set aside areas for the use of his tenants in common owes them a duty of reasonable and ordinary care to keep the premises safe.... '[H]e is ... obliged to use reasonable diligence and ordinary care to keep the portion retained under his control in a reasonably safe condition.'" *Scott,* 278 Md. at 165, 359 A.2d at 552 (quoting *Elmar Gardens, Inc. v. Odell,* 227 Md. 454, 457, 177 A.2d 263, 265 (1962)). We concluded:

"The duty of a landlord to exercise reasonable care for the safety of his tenants in common areas under his control is sufficiently flexible to be applied to cases involving criminal activity without making the landlord an insurer of his tenant's safety. If the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take reasonable measures, in view of the existing circumstances to eliminate the conditions contributing to the criminal activity."

*Scott,* 278 Md. at 169, 359 A.2d at 554.

In each of these cases, this Court required that the landlord have had some type of control, *e.g.,* the landlord's control over common areas, and that the landlord have knowledge or reason to know that a danger was posed to those in the common areas. In the instant case, both Petitioners Shields and Johnson were injured in the common area of the Joint Venture strip mall. Shields was attacked as she tried to return to her car when Trouble burst through the door of Thomas's office. Johnson was injured as he accompanied one of his customers to pick up her car. Respondents seem to concede that these attacks occurred in the parking lot of the strip mall but contend that there was no evidence presented

that the parking lot was a "common area." We disagree. First, as we noted above, we are obligated in this appeal to look at the facts in the light most favorable to the Petitioners. *See, e.g., Martens Chevrolet,* 292 Md. at 331, 439 A.2d at 536. The evidence presented at trial in this matter included the introduction of photographs which show the parking area of the strip mall. Johnson testified that one of these photographs shows "the bay area, you know, and the common area" and that the other photograph shows "the lot, you know, with a lot of trash and junk in the parking lot." Although we do not comment on the weight of this evidence, we are persuaded that from the photographs and the accompanying testimony that a jury could have concluded that the parking lot was a common area.[4] Respondents further argue that there was no evidence Trouble was being kept in the common area. This, however, misses the point entirely. The issue is not whether Trouble was being kept in the common area, but rather whether Trouble's presence posed a threat to those in the common area.

## OTHER JURISDICTIONS

Because there are no Maryland cases specifically addressing landlord liability for injuries caused by a tenant's dog in the common area, we now turn to cases from other jurisdictions that have addressed the issue. Other jurisdictions have generally been willing to impose liability on landlords where injuries have occurred in common areas. *See, e.g., Bailey v. DeSanti,* 36 Conn.Supp. 156, 414 A.2d 1187 (1980); *Lidster v. Jones,* 176 Ga.App. 392, 336 S.E.2d 287 (1985), *cert. dismissed sub nom. Pine Terrace Associates, Ltd. v. Lidster,* 255 Ga.

---

4. Although it is unclear from the record whether the general lease used for tenants at the strip mall was actually admitted into evidence, it was included in the record, and we note that the lease specifically defines common areas to include "the parking areas and facilities" and states that the "Landlord shall ... have the sole and exclusive control, management and direction of the common areas." Regardless of whether this lease was admitted, we believe that the evidence that the parking lot was a common area was sufficient to go to the jury.

405, 341 S.E.2d 8 (1986); *McDonald v. Talbott*, 447 S.W.2d 84 (Ky.Ct.App.1969); *Castillo v. Santa Fe County*, 107 N.M. 204, 755 P.2d 48, 51 (1988)("As landlord, [the operator of county-owned public housing] was under a duty to maintain safely those areas expressly reserved for the use in common of the different tenants."); *Siegel v. 1536–46 St. John's Place Corporation*, 184 Misc. 1053, 57 N.Y.S.2d 473 (N.Y.City Ct.1945); *Baker v. Pennoak Properties, Ltd.*, 874 S.W.2d 274 (Tex.Ct. App.1994).

In *Linebaugh v. Hyndman*, 213 N.J.Super. 117, 516 A.2d 638 (1986), *aff'd*, 106 N.J. 556, 524 A.2d 1255 (1987), for example, the plaintiff sued the landlord for injuries sustained by her daughter in a common backyard shared by two individuals who rented separate units in a duplex. Plaintiff's daughter, an invitee, had been attacked by a dog owned by one of the tenants while the other tenant was babysitting the plaintiff's daughter. *Linebaugh*, 516 A.2d at 639. There was evidence that the nonresident, defendant/landlords had knowledge of the dog's presence and vicious propensities. *Id.* The trial court granted summary judgment in favor of the landlord. *Id.* The Superior Court of New Jersey reversed, noting that "[w]here a dwelling contains two or more apartments which are rented to separate tenants and the landlord provides certain facilities for their common use or benefit, possession and control of such portions are deemed to be retained by him," and thus, the landlord has a duty to exercise reasonable care in the maintenance of these common areas. *Linebaugh*, 516 A.2d at 640. The Court held that "a landlord's responsibility to exercise reasonable care in the maintenance of common areas under his control encompasses a duty owed to his tenant's invitees to prevent injury from a vicious animal kept on such premises with his knowledge." *Linebaugh*, 516 A.2d at 639. According to the court, "[w]here a landlord, either by affirmative consent or by his failure to take curative measures, permits another to harbor [a vicious] animal in those areas in which he retains control, he is liable to his tenants and others lawfully on the premises for the injuries that result." *Linebaugh*, 516 A.2d at 640. The court also

emphasized that its position was consistent with traditional principles of negligence and that "the fact that the risk of injury is created by another, here a tenant, cannot serve to insulate the tortfeasor from the consequences flowing from his failure to perform his obligation." *Id.*

Likewise in *Siegel, supra,* a New York court addressed the liability of the corporate owner of a fifty-two family apartment house for injuries sustained by child in the common area of the apartment house. The child was attacked by a dog owned by the resident/superintendent while walking up a common stairway. *Siegel,* 57 N.Y.S.2d at 473–74. There was sufficient evidence that the owner had notice of the dog's presence and viciousness. *Siegel,* 57 N.Y.S.2d at 475. The court held that,

> "[i]n as much as this was a fifty-two family multiple dwelling, the public halls and stairs of which were open and frequented by tenants and their family members as well as others having business and social relations therewith, it became a continuing duty upon the owner of this building to keep such common ways in a reasonably safe condition resultant upon such known general usage and to exercise such care in the premises as a reasonably prudent person might under the same circumstances. Such duty extended to the exclusion of known vicious animals frequenting thereabout."

*Id.* Noting the owner had knowledge of the dog's presence and viciousness, had control over the portion of the premises where the incident occurred, and had the "power to expel the dog and its owner as well," the court granted judgment in favor of the plaintiffs. *Id.*

In a similar case, *Baker, supra,* however, the Court of Appeals of Texas refused to reverse summary judgment which had been granted in favor of the defendant/landlord because, the court concluded, the plaintiff failed to meet her burden of proof regarding the landlord's knowledge of the dog and its dangerous propensities. *Baker,* 874 S.W.2d at 277. There, the plaintiff, a tenant, was injured by another tenant's dog in the common area of an apartment complex where she and the

other tenant were each walking their respective dogs. *Baker,* 874 S.W.2d at 275. The plaintiff sued the landlord of the apartment complex for damages as a result of this attack. *Id.* The court noted that it was well-settled in Texas "that a lessor retaining control over premises used in common by different occupants of his property has a duty to exercise reasonable care to keep those common areas reasonably safe for the use of tenants and their guests." *Id.* This duty, the court concluded, encompasses "protecting tenants from known vicious dogs." *Baker,* 874 S.W.2d at 277. The court set forth a two-part test: "(1) the injury must have occurred in a common area under the control of the landlord; and (2) the landlord must have had actual or imputed knowledge of the particular dog's vicious propensities." *Id.* Concluding that the plaintiff failed to meet her burden of proof regarding the second element, however, the court ruled in favor of the landlord.

Because the common area cases in Maryland and other jurisdictions generally turn on a landlord's knowledge and control, we next turn to whether the Respondent/Landlords in this case had sufficient knowledge and control to send the issue of liability to the jury.

## CONTROL

As we noted above, the injuries here occurred in the common area, *i.e.,* in the parking lot of the strip mall, an area over which the Respondents retained control. The Respondents, nonetheless, argue that they cannot be held liable because they did not have control over the dog ("the device alleged to have caused the injury"). We disagree. Our common area cases have not required that a landlord have specific control over the instrumentality that causes the injuries, but rather have required that the landlord know or have reason to know that there was the threat of injury from the instrumentality in the common areas over which the landlord retains control.

For example, in *Langley Park Apts., supra,* we concluded that a landlord could be held liable for injuries caused by weather conditions, *i.e.,* a patch of ice in the common area.

234 Md. at 410, 199 A.2d at 624. There, this Court held that the "accumulation of ice or snow upon the common approaches to tenement houses or multi-family apartment buildings may result in imposing on the landlord liability for injuries due to it" where the landlord knew or should have known of the existence of the dangerous condition. *Id.* Likewise, in *Scott,* this Court concluded that a landlord could be held liable for the criminal acts of third parties where the landlord knew or should have known of "criminal activity against persons or property in the common areas." 278 Md. at 169, 359 A.2d at 554. Here, although the Respondents may not have had control over Trouble, as we shall discuss below, they knew or had reason to know that the dog posed a danger to those in the common area and, thus, had a duty to take reasonable measures to protect those lawfully on the premises.

Moreover, the Respondents here could have exercised control over Trouble by refusing to re-let the premises to Thomas unless Thomas agreed not to bring Trouble there. Thomas had originally leased the premises pursuant to a written lease; however, that lease had expired prior to the attacks that led to the instant case, and Thomas remained as a month-to-month tenant. As each month went by, the premises were in effect re-let to Thomas. Thus, each time, the Respondents had the opportunity to refuse to re-let the premises, thereby abating the danger posed by Trouble's presence.

This conclusion is supported by case law from other jurisdictions. *See, e.g., Portillo v. Aiassa,* 27 Cal.App.4th 1128, 32 Cal.Rptr.2d 755 (1994) (affirming jury verdict in favor of plaintiff and holding that landlord had a duty to remove dangerous dog kept by tenant on commercial premises); *Vigil by and through Vigil v. Payne,* 725 P.2d 1155, 1157 (Colo.Ct. App.1986); *Strunk v. Zoltanski,* 62 N.Y.2d 572, 479 N.Y.S.2d 175, 468 N.E.2d 13, 15 (1984); *Cronin v. Chrosniak,* 145 A.D.2d 905, 536 N.Y.S.2d 287, 288 (1988) (reversing summary judgment that had been granted in favor of the landlord and noting that the owners of the dog that caused the injury at issue were month-to-month tenants and thus the landlords had the "capability to require the tenants to get rid of the dog").

Some cases in other jurisdictions have viewed the act of re-letting as an affirmative act giving rise to the potential for liability. *Vigil,* 725 P.2d at 1157; *Strunk,* 479 N.Y.S.2d 175, 468 N.E.2d at 15. For example, in *Strunk,* a New York court affirmed a trial court's denial of the landlord's motion for summary judgment where the plaintiff was attacked by a dog kept by a tenant on the premises leased to the tenant. There was evidence that prior to leasing the premises the landlord knew that the tenant had a vicious dog and that the tenant intended to keep the dog on the premises. 479 N.Y.S.2d 175, 468 N.E.2d at 15. The *Strunk* court held that "[a] landlord who, with knowledge that a prospective tenant has a vicious dog which will be kept on the premises, nonetheless leases the premises to such tenant without taking reasonable measures . . . to protect persons who might be on the premises from being attacked by the dog may be held liable to a person who while thereafter on the premises is bitten by the dog." 479 N.Y.S.2d 175, 468 N.E.2d at 14. The court reasoned that "the landlord, by leasing the premises to the owner of the dog, could be found affirmatively to have created the very risk which was reasonably foreseeable and which operated to injure plaintiff." *Strunk,* 479 N.Y.S.2d 175, 468 N.E.2d at 15.

Similarly, in *Vigil,* 725 P.2d at 1156, a six-year-old child was attacked and injured by two dogs while playing with a tenant's daughter on rented premises. There was evidence that the landlord had actual knowledge of the dogs' vicious propensities *before* leasing the premises to the dogs' owners. *Id.* The Colorado Court of Appeals reversed the trial court's dismissal of the plaintiffs' complaint holding that, under the circumstances, the allegations in the complaint were sufficient to demonstrate that the landlords had a "duty to take reasonable precautions to protect third persons from the animal." *Vigil,* 725 P.2d at 1157. Noting that "[g]enerally, where a landlord is out of possession of leased premises and the tenant has exclusive control of those premises, the landlord is not responsible for attacks by animals kept by the tenant on the leased premises," the court specifically limited its holding to "those

instances in which the landlord has actual knowledge of the vicious actions of the animal *before* entering into a rental agreement with the animal's owner and nevertheless subsequently performs the affirmative act of entering into a rental agreement with the animal's owner." *Id.* (emphasis added).

The case at bar is analogous to both *Strunk* and *Vigil.* Although there is no suggestion in the instant case that the Respondents knew Trouble would be kept on the premises and that Trouble was vicious prior to the initial leasing of the premises to Thomas,[5] there is evidence that the Respondents had such knowledge months prior to the attacks on Shields and Johnson. As we noted above, Thomas was a month-to-month tenant by the time of the attacks, and thus, each month the premises were in effect re-let to him. This necessarily occurred several times prior to the attacks. Respondents should have exercised reasonable care in deciding to re-let the premises to Thomas.

We conclude that the Respondents' control over the common area upon which the injuries in the instant case occurred coupled with the Respondents' ability to control Trouble's presence at the strip mall by refusing to renew the month-to-month tenancy with Thomas unless he got rid of Trouble or took other satisfactory measures to abate the danger posed by Trouble provide a sufficient basis for liability. Thus, this case should have survived a motion for judgment provided that the Respondents knew or should have known that Trouble's presence posed a danger to those in the common area. We, therefore, turn to whether the Respondents knew, or should have known, that Trouble's presence posed a danger to those in the common area such that the Respondents should have exercised their control.

### KNOWLEDGE

█ The Respondents in the instant case strenuously argue that the Petitioners have failed to meet their burden of proof

---

**5.** The actual lease between Thomas and the Respondents could not be located for trial.

regarding knowledge. We disagree. We are satisfied that there is sufficient evidence of knowledge in this case to go to the jury. As we noted above, because this case comes to us from the granting of a motion for judgment, we are required to look at the facts in the light most favorable to the Petitioners. We shall address the Respondents' lack of notice argument first with respect to the attack on Johnson and then with respect to the Shields attack.

By the time Johnson was attacked on January 30, 1995, the Respondents clearly had knowledge of Trouble's presence and vicious propensities. The record indicates that Respondents [6] were served with Shields's original complaint on December 10, 1993. While Respondents concede that the Shields complaint gave them notice of Trouble's presence and vicious propensities, they argue that it did not give them the necessary notice, *i.e.*, that Trouble would be present in the parking lot after the August 28, 1993 attack on Shields. This argument is without merit. Obviously, a jury could find that Respondents should have known from the attack on Shields in the parking lot that Trouble was at times present in the common area, was vicious, and thus posed a threat to those in the common area. Respondents also argue that after the Shields attack Wagman told Thomas to get rid of Trouble and, therefore, had no reason to know Trouble would be on the premises after his conversation with Thomas. Wagman testified that, prior to the Johnson attack he had "advised Thomas . . . that the pit bull did not belong there and should not be brought on the premises, and he had agreed. So that—he did not keep it there, to the best of my knowledge at the time." This assertion, however, is contradicted by Thomas's testimony that Wagman never told him not to have the dog on the premises and by Wagman's own testimony that Thomas "had the right to take the dog with him whenever he wanted to. That was

---

6. Although, as we noted above, *see supra* n. 2, the original complaint only names Thomas and Wagman as defendants, the fact that Wagman, the managing or leasing agent of the property for the partnership, was served with notice of an attack by Trouble was enough to put Respondents on notice that Trouble was vicious.

his dog. He had told me he would not keep the dog on the premises. That doesn't mean he couldn't bring it with him from time to time." This dispute is a question of credibility best left for the jury to decide. Moreover, even if the jury believes that Wagman told Thomas not to keep Trouble on the premises, it was for the jury to determine whether it was then reasonable for Wagman to believe that Trouble was no longer being kept there.[7] Additionally, Johnson testified that from the time Johnson moved to the strip mall, Johnson and Wagman had frequently discussed Trouble's viciousness and the possible threat Trouble's presence posed. Specifically, Johnson testified that they had discussed that "Trouble was extremely vicious and ... might break loose from the chain that he had [on him] ... when he brought him through the lot, because there are a lot of children there, came through there."

Respondents' knowledge prior to the Shields attack is less well established. Respondents first argue that there is no evidence that Trouble had bitten anyone prior to the attack on Shields. Maryland, however, does not subscribe to the one bite rule and thus Shields is not required to prove that Trouble bit someone prior to the attack on her in order to recover. *See Bachman v. Clark*, 128 Md. 245, 248, 97 A. 440, 441 (1916) ("It must first be shown, in order to render the owner liable for damages to one bitten by his dog, that the dog had a vicious propensity, and second that such vicious propensity or inclination was known to its owner. But the owner's knowledge of the dog's vicious propensity need only be such as to put him on his guard, and to require him as an ordinary prudent person to anticipate the act or conduct of the dog resulting in the injury for which the owner is sought to be held liable."); *Twigg v. Ryland*, 62 Md. 380, 385–86 (1884) (requiring only that the owner or keeper of a vicious animal have "knowledge of [a vicious animal's] disposition to commit such

---

7. Wagman also stated that, in order to assure himself that Thomas did in fact get rid of Trouble, Wagman went to the shop from time to time and looked and did not see Trouble. This, however, was also a question of credibility best left to a jury.

injur[ies]" and not that the owner "has seen the animal attack mankind"); *cf. McDonald v. Burgess,* 254 Md. 452, 457, 459–60, 255 A.2d 299, 301, 303 (1969) (affirming summary judgment in favor of dog owner where plaintiff failed to show either that the dog was vicious *or* that it had previously bitten a human being).

Although there was no evidence that Trouble had bitten anyone prior to Shields, there was sufficient evidence upon which a jury could find that Respondents knew or should have known of Trouble's presence and viciousness and that Trouble posed a threat to those in the common area prior to the Shields attack. There was ample indication that Wagman was aware of Trouble's presence at the strip mall. Thomas had been Wagman's tenant since approximately 1991 or 1992 and, in fact, at some point during that time Thomas was Wagman's only tenant. There was undisputed evidence that during that time Wagman would come by Thomas's shop. Johnson testified that he would see Wagman on the premises of the strip mall approximately twice a week. Thomas, the dog's owner, testified that Wagman was aware of Trouble's presence from the time Trouble was a puppy. He also testified that Wagman had probably seen the dog a few times and that, in addition, Wagman had asked how the dog was doing on several occasions. During that same time period, several witnesses testified to having seen Trouble on the premises. Johnson testified that, "practically every single day" since 1991, Johnson saw Thomas take Trouble and the other two dogs out for a run each morning and evening. Teresa Denny, an employee of Johnson, indicated that she would visit Thomas's shop once or twice a week and that "the dog was always there." Moreover, Wagman himself testified that he had seen Trouble prior to the Shields attack. Thus, Wagman clearly knew of Trouble's presence at the strip mall.

There was also evidence that Trouble was vicious. Johnson testified that Trouble was "very vicious, and that's putting it mildly, a very vicious pit bull. * * * [H]e kept the dog ... in the shop. The dog would ... when people came to the shop, even people that he knew, ... the dog would actually try to

tear out of the cage he was in." Likewise, Denny testified that Trouble was a "very strong," large, mean dog. She elaborated upon this assertion noting that Trouble would "growl at you and just try to get to you. It was just mean, it was vicious. It was a mean dog." She also described an incident where Trouble jumped at the door when she tried to enter the door of Thomas's bay.

There was evidence that Wagman knew that Trouble was vicious. First, Wagman's own testimony indicates that he had notice of Trouble's vicious propensity prior to Trouble's attack of Shields. Wagman testified that he had visited Thomas and seemed to indicate he had seen Trouble in a cage prior to the Shield's attack. This cage was later described by Officer Mattingly as "a chicken wire-type pen" which "would not have ... met county standards." Wagman further testified that prior to the Shields attack he "didn't think that a pit bull should be on the premises when there was this kind of traffic there. There were other tenants, other customers coming in. And so, I spoke with [Thomas] and told him not to keep the pit bull there." [8] Additionally, although Wagman claimed not to know that Trouble was dangerous, he testified that he *thought it would be a threat to people* on the premises and people would be frightened by it." (Emphasis added). Wagman also testified regarding a conversation he had with Thomas about Trouble in which Wagman indicated that Trouble "was too dangerous to have around." In response to questioning by counsel for Petitioners, Wagman also indicated that he knew that Trouble "had to go." Moreover, given the testimony of Wagman's frequent visits to the premises and given the

---

**8.** It is possible that in asking Thomas to remove Trouble from the premises, Wagman fulfilled his duty. Whether or not this was a sufficient and reasonable measure, however, is for the jury to determine. We also note that Thomas claims that Wagman never told him not to have the dog on the premises but rather would ask how Trouble was doing even after Trouble bit Shields. Moreover, Wagman himself testified that Thomas "had the right to take the dog with him whenever he wanted to. That was his dog. He had told me he would not keep the dog on the premises. That doesn't mean he couldn't bring it with him from time to time."

testimony of other witnesses that Trouble was always present and that they had often seen Trouble act viciously, a jury could conclude that Wagman also had the opportunity to observe Trouble's viciousness.

Respondents argue, however, that even if Wagman knew of Trouble's viciousness there is no evidence that Wagman knew Trouble was permitted to run loose in the parking lot or that Trouble posed a threat to those in the common area. In fact, they argue, the evidence presented indicates that Trouble was always caged or on a chain when Wagman saw him. There was evidence, however, that Trouble was not always kept in the cage. For example, Johnson testified that Thomas took Trouble and the other two dogs out twice a day for a run, that Johnson had seen the dog walking around at night on two occasions, and that there were times when Thomas would let Trouble loose in the office during the day when the office was open to the public. Additionally, Thomas testified that Trouble was let out of the cage to walk around the shop in the evenings. Although no one testified that Wagman saw Trouble uncaged, given the amount of time Trouble was uncaged and given Wagman's frequent visits to the strip mall, a jury could conclude that Wagman had seen Trouble uncaged. Moreover, the cage in which Wagman observed Trouble appeared to be made of chicken wire and may have put Wagman on notice that Trouble posed a danger to those in the common area. In fact, Wagman's deposition testimony suggests his awareness of danger:

"Q:  * * * [W]ere you upset when you saw that dog in that cage?

A:  No.

Q:  You were not?

A:  I was not upset.

Q:  You knew it was dangerous?

A:  I knew it was dangerous."

While there is some dispute over just what was dangerous according to Wagman, it is clear that he was admitting he

knew one of the following was dangerous: Trouble; the cage; or Trouble's presence in the flimsy cage. Furthermore, if the jury believes that Respondents knew of Trouble's presence in Thomas's bay, the jury may also logically conclude that Wagman should have known there would be times that it would be necessary for Trouble to be in the common areas to be walked, exercised, brought to a veterinarian, etc. Although we make no comment on the weight of the evidence in this case, we believe that the evidence was sufficient to go to the jury.

Finally, we note another aspect of this case that leads us to the conclusion that the landlord may be under a duty under the facts of the instant case. Both injured parties were invitees at the time they were attacked. An invitee is generally owed an even higher duty than that owed a social guest. *Cf. Flippo*, 348 Md. at 688–89, 705 A.2d at 1148 (noting that the possessor of property has a duty of reasonable care to an invitee to keep the premises safe, while the possessor's duty to a social guest is merely to " 'warn the guest of dangerous conditions that are known to the possessor but not easily discoverable' " (citation omitted)).

### III.

We hold that a landlord of commercial property may be held liable for injuries sustained in the common area and caused by a pit bull kept on the leased premises by one of the tenants where the landlord has knowledge of the potential danger in the common area and the ability to rid the premises of that danger by refusing to re-let the premises. Because there is sufficient evidence that Respondents had adequate control and knowledge in this case to warrant the imposition of liability, we conclude that the Respondents may have been under a duty to exercise reasonable care, which included protecting those lawfully on the premises from being attacked in the common area by a dog owned and kept on the premises by a tenant. Our holding today, however, is limited to injuries occurring within the common area. We expressly do not decide what would have happened here had the injuries occurred within the leased premises. Under the facts presented

in this case, it was error to grant Respondents' motion for judgment. We shall therefore reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RE- SPONDENT.**